# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAMIEN T. DOSTER,<br><br>        Plaintiff,<br><br>vs.<br><br>JEFFREY A. BEARD, et al.,<br><br>        Defendants. | 1:15-cv-01415-DAD-GSA-PC<br><br>**FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED**<br>**(ECF No. 64.)**<br><br>**OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS** |

## I.    INTRODUCTION

Plaintiff Damien T. Doster is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983.   This case now proceeds with Plaintiff's First Amended Complaint filed on March 25, 2016, against defendants Chief Deputy Warden F. Vasquez, Yard Captain P. Llamas, Sergeant Sarah Leon, and Maintenance Engineer Ric Pavich, on Plaintiff's claim for deprivation of hot water in violation of the Eighth Amendment, and related negligence claims.[1]  (ECF No. 13.)

---

[1] On March 29, 2016, the court found that Plaintiff's First Amended Complaint stated Eighth Amendment claims for adverse conditions of confinement against defendants Vasquez, Llamas, Leon, and Pavich, but no other claims.  (ECF No. 14.)  On September 26, 2017, the court dismissed all of Plaintiff's claims except the claim that he was deprived of hot water in violation of the Eighth Amendment.  (ECF No. 60.)  Therefore, this case now proceeds with the First Amended Complaint against defendants Vasquez, Llamas, Leon, and Pavich, only on Plaintiff's claim that he was deprived of hot water.

On November 30, 2017, Defendants filed a motion for summary judgment on the grounds that the undisputed facts show that Defendants: (1) did not violate Plaintiff's Eighth Amendment rights; (2) were not negligent; and, (3) are entitled to immunity.[2]  (ECF No. 64.) On February 5, 2018, Plaintiff filed an opposition to the motion.  (ECF No. 69.)  On February 9, 2018, Defendants filed a reply.  (ECF No. 70.)  The motion is deemed submitted.  Local Rule 230(*l*).

For the reasons set forth below, the court recommends that Defendants' motion for summary judgment be granted.

## II.  SUMMARY OF ALLEGATIONS AND CLAIMS AT ISSUE IN THIS CASE[3]

### A.  <u>Allegations</u>

The events at issue in this case arose at Corcoran State Prison (CSP) in Corcoran, California, when Plaintiff was incarcerated there in the custody of the California Department of Corrections and Rehabilitation (CDCR).  Defendants Vasquez, Llamas, Leon, and Pavich were employees of the CDCR at CSP during the relevant time.  Plaintiff's allegations follow.

On May 18, 2015, the hot water was turned off to the housing unit and in Plaintiff's solitary cell.  On June 3, 2015, defendants Vasquez and Leon were informed that Plaintiff's cell had no hot or warm water.  Defendants Vasquez and Leon told Plaintiff the hot water would be back on in a week or a few days, and to quit crying and complaining.  This went on for months while Plaintiff's requests for interviews went unanswered.

On June 6, 2015, Plaintiff sent a CDCR-22 form request for interview to defendant Llamas, informing Llamas of the adverse conditions.  Defendant Llamas responded that it was a maintenance issue and could not be corrected at her level.

On July 1, 2015, Plaintiff submitted a CDCR-22 form request for interview to defendant Pavich, informing Pavich of the adverse conditions which arose on May 18, 2015.  On July 15,

---

[2] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  <u>Woods v. Carey</u>, 684 F.3d 934, 939-41 (9th Cir. 2012); <u>Rand v. Rowland</u>, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 64-1.)

[3] This summary only reflects Plaintiff's claim that he was deprived of hot water.

2015, defendant Pavich responded that he was working on the hot water loop, and that the hot water would be running by July 30, 2015.

Defendants Vasquez, Llamas, Leon, and Pavich all had authority to declare Plaintiff's cell unsafe for occupancy until the hot water was restored, but they did not do so. Plaintiff suffered physical injuries, mental and emotional pain and suffering, humiliation, and fear.

Plaintiff requests monetary damages and declaratory relief.

**B.** **Claims**

This case now proceeds against defendants Vasquez, Llamas, Leon, and Pavich, on Plaintiff's Eighth Amendment claims that he was deprived of hot water, and related state law negligence claims.

## III. SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for

trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## IV.     PLAINTIFF'S CLAIMS – LEGAL STANDARDS

### A.     Eighth Amendment Conditions Of Confinement Claim

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)) (quotation marks omitted). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted). Thus, conditions which are devoid of legitimate penological purpose or contrary to

4

evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. Morgan, 465 F.3d at 1045 (quotation marks and citations omitted); Hope v. Pelzer, 536 U.S. 730, 737, 122 S.Ct. 2508 (2002); Rhodes, 452 U.S. at 346. Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted).

      To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety. E.g., Farmer, 511 U.S. at 847; Thomas, 611 F.3d at 1150-51; Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998). The deliberate indifference standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ." Farmer, 511 U.S. at 834. "[R]outine discomfort inherent in the prison setting" does not rise to the level of a constitutional violation. Johnson, 217 F.3d at 731. Rather, extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Farmer, 511 U.S. at 834; Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995 (1992). The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. Johnson, 217 F.3d at 731. Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S. at 837. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45. Mere negligence on the part of the prison official is not sufficient to

///

establish liability, but rather, the official's conduct must have been wanton.  Id. at 835; Frost, 152 F.3d at 1128.

**B.     State Law Negligence Claim**

"Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'"  Corales v. Bennett, 567 F.3d 554, 572 (9th Cir. 2009) (quoting McGarry v. Sax, 158 Cal.App.4th 983, 994, 70 Cal.Rptr.3d 519 (2008) (internal quotations omitted)).

## V.     DEFENDANTS' UNDISPUTED FACTS (DUF)[4]

Defendants submitted the following facts in support of their motion for summary judgment.  (ECF No. 64-3.)

1.     Plaintiff Damien Doster (CDCR No. T-46801) is an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR").  Compl., ECF No. 1 (Compl.), at 1; Declaration of Andrea R. Sloan, Exhibit D, Deposition of Damien Doster (Doster Decl.) at 9:4-6; Declaration of P. Llamas in Support of Defendants' Motion for Summary Judgment (Llamas Decl.) at ¶ 2.

2.     At all times relevant to the lawsuit, Plaintiff was housed at California State Prison – Corcoran (COR) on the Level IV yard in Building 4A2.  Compl. at 7; Declaration of S. Leon in Support of Defendant' Motion for Summary Judgment (Leon Decl.) at ¶ 2; Llamas Decl. at ¶ 2.

---

[4]  Plaintiff failed to properly address Defendants' statement of undisputed facts, as required by Local Rule 260(b).  Accordingly, the court may consider Defendants' assertions of fact as undisputed for purposes of this motion.  Id; Fed. R. Civ. P. 56(e)(2).  Additionally, in light of the Ninth Circuit's directive that a document filed *pro se* is "to be liberally construed," Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, and Rule 8(e) of the Federal Rules of Civil Procedure provides that "[p]leadings shall be construed so as to do justice," see Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007), the court shall strive to resolve this motion for summary judgment on the merits.

3.     M. Fechner was the Correctional Plant Manager II (CPM II) at all times relevant to Plaintiff's lawsuit, and worked directly with Chief Deputy Warden Vasquez on major projects. Declaration of M. Fechner in Support of Defendants' Motion for Summary Judgment (Fechner Decl.) at ¶ 1; Declaration of F. Vasquez in Support of Defendants' Motion for Summary Judgment (Vasquez Decl.) at ¶ 3.

4.     As CPM II, Fechner was responsible for requesting funding for major projects and assisting Inmate Ward Labor (IWL) with the repairs. He oversaw maintenance to the entire COR facility, which included providing hot water to all of the buildings so it could be used for sinks and showers. Fechner Decl. at ¶ 3.

5.     IWL is composed of CDCR employees who use union halls (journey level contractors) to supervise and train inmates in various fields of construction. The union halls provide journey level citizen contractors. Inmates who assist need to be directed by a certified union member who supervises the inmate crew. IWL also purchases the parts necessary to accomplish repairs through approved funding through the Facilities Asset Management Branch (FAMB). Fechner Decl. at ¶ 4; Vasquez Decl. at ¶ 4.

6.     The FAMB is located in Sacramento and provides support to Plant Operations state-wide. FAMB supports Plant Operations as it pertains to funding, emergency services, and labor. Major funding projects require FAMB approval and funding FAMB. Fechner Decl. at ¶ 5; Vasquez Decl. at ¶ 5.

7.     CPM II Fechner discovered a hot water pipe leak around May 5, 2015 and notified Defendant Vasquez. Fechner was able to contain the leak by slowing down the main hot water pump feeds. This allowed hot water to continue running to the affected facilities. Fechner Decl. at ¶ 7; Vasquez Decl. at ¶ 7.

8.     On May 5, 2015, CPM II Fechner notified the FAMB of the underground hot water leaks and initiated the funding process for approval. When major repairs

///

are needed, COR, and other prisons, are required to go through the FAMB for funding. Fechner Decl. at ¶ 8; Vasquez Decl. at ¶ 8.

9. At the time, the underground pipes were approximately 30-years old. The insulation around the pipes exceeded its life expectancy, exposing the steel pipes to the underground elements. This caused the pipes to rust through and leak. Fechner Decl. at ¶ 6; Vasquez Decl. at ¶ 6.

10. Hot water remained on in Plaintiff's cell and the showers in his housing unit through at least the first two weeks of May 2015. Sloan Decl., Exhibit A, Declaration of Damien Doster (Doster Decl.) at 1.

11. On May 18, 2015, the institutional hot water system suffered a significant failure on the water lines feeding the level IV A yard causing major water leaks. Fechner Decl. at ¶ 9; Pavich Decl. at ¶ 6; Vasquez Decl. at ¶ 9; Llamas Decl. at ¶ 6.

12. The massive leaks caused the institution to lose 3,600-4,000 gallons of potable water per hour. California was [in] its fourth year of a severe drought and the significant loss of water, further necessitated the isolation and shut off of the hot water. Fechner Decl. at ¶ 10; Pavich Decl. at ¶ 7; Vasquez Decl. at ¶ 10; Llamas Decl. at ¶ 7.

13. On May 18, 2015, hot water to the institution Levels I and IV was isolated and turned off. Compl. at 9; Doster Depo at 13:3-5; Doster Decl. at 1; Fechner Decl. at ¶ 9; Pavich Decl. at ¶ 8; Vasquez Decl. at ¶ 9. Compl. at 9; Doster Depo at 13:3-5; Doster Decl. at 1; Fechner Decl. at ¶ 9; Pavich Decl. at ¶ 8; Vasquez Decl. at ¶ 9.

14. The leak affecting the Level IV yard was on the east corner of the Level IV Records Trailer. It required abandoning the water supply and returning it in the ground with pre-fabrication of new pipe. The pipe ran under the trailer and needed to be reinstalled away from the trailer. This required IWL's assistance

///

for material, manpower, equipment, and expertise. Fechner Decl. at ¶ 13; Vasquez Decl. at ¶ 13.

15. Another leak was located next to a 12,470 volt power pole that had an underground feed to a Pad Mounted Transformer (PDT). This required assistance from an electrical contractor to de-energize the power to these feeds and support the pole while IWL excavated the area. Fechner Decl. at ¶ 11; Vasquez Decl. at ¶ 11.

16. Another leak was located in Level I just north of the dining facility. It was located under the parking lot and road which had a giant concrete thrust block poured over it. It required pulling up the parking lot and road, cutting out a large section of supply and return piping, and lifting it out with a crane. This required IWL's assistance for material, manpower, equipment, and expertise. Fechner Decl. at ¶ 12; Vasquez Decl. at ¶ 12.

17. The Level I isolation valves located outside the 4A2 building also needed to be replaced to restore hot water to the Level IV buildings. Fechner Decl. at ¶ 14; Vasquez Decl. at ¶ 14.

18. CPM II Fechner gathered all information regarding the leaks and kept the FAMB and Defendant Vasquez apprised of all developments throughout May and June. He sent photographs and detailed the emergency leak issues for the FAMB as part of his responsibility for requesting funding for the project and organizing labor. Fechner Decl. at ¶ 15; Vasquez Decl. at ¶ 15.

19. Because there were over 500 inmates affected on the Level IV yard, over 80 inmates in Plaintiff's building alone, the institution did not have the ability to move the inmates to another yard where there may have still been hot water, or move the inmates to another facility. At that time, COR's SHU buildings were filled to capacity. Escorting the inmates to another yard was simply not an option. To move the inmates to another facility, Population Management would be involved to locate other facilities that have available beds with the same

custody level (SHU) equipped to house the inmates. CDCR's Division of Adult Institutions at headquarters would also be involved to conduct such a large inmate transfer. Fechner Decl. at ¶ 16; Vasquez Decl. at ¶ 16; Llamas Decl. at ¶¶ 12, 14; Leon Decl. at ¶ 12.

20. Work could not begin on the hot water pipe repairs until COR received the emergency funding for the project. Without the funding, COR could not purchase the equipment needed nor contract with IWL to make the repairs. CPM II Fechner kept the FAMB and Warden Vasquez apprised of all issues throughout the process while awaiting funding. Fechner Decl. at ¶ 17; Vasquez Decl. at ¶ 17.

21. The FAMB is wholly responsible for approving the funding and requesting the work to be done by IWL. Neither CPM II Fechner, nor anyone else at COR had the authority to fund the repairs and work. Fechner Decl. at ¶ 18; Vasquez Decl. at ¶ 18.

22. On May 18, 2015, Fechner developed a plan to repair the leaks with Departmental Construction Management Supervisor (DCMS) D. Mahaffey. Fechner worked directly DCMS Mahaffey who coordinated with IWL to facilitate funding and approval for labor to make the repairs. Fechner Decl. at ¶ 19; Vasquez Decl. at ¶ 19.

23. On June 22, 2015, CPM II Fechner finished preparing the Project Request form for submission to the FAMB for final approval, requesting $300,000 to accomplish the necessary repairs. Fechner Decl. at ¶ 20; Vasquez Decl. at ¶ 20.

24. On June 23, 2015, Chief Deputy Warden Vasquez approved the request. COR then sent the request to the FAMB. Fechner Decl. at ¶ 21; Vasquez Decl. at ¶ 21.

25. At this time, the funding had already been internally approved and work had already begun to restore the hot water. Fechner Decl. at ¶ 22; Vasquez Decl. at ¶ 22.

26. On June 28, 2015, Plaintiff authored a CDCR Form 22 Request for Interview for Acting Captain Llamas, wherein he complained about the hot water issue. Compl. at 10; Llamas Decl. at ¶ 16.

27. On June 29, 2015, Llamas responded to Plaintiff's request informing him that the hot water was a maintenance issue that she could not correct. She informed Plaintiff he could forward his concerns to maintenance and that it may be a couple more weeks until the hot water was restored. Compl. at 10; Llamas Decl. at ¶ 17.

28. On July 1, 2015, Plaintiff resent his Request for Interview to Llamas, demanding that she fix the hot water issue. Llamas then forwarded Plaintiff's request to Engineer Pavich. Compl. at 10.

29. The CDCR Form 22 Request for Interview was the only form of communication Plaintiff had with Acting Captain Llamas. Doster Depo. at 19:21-20:10; Llamas Decl. at ¶¶ 16-17.

30. On July 1, 2015, IWL was having difficulty locating a welder cleared to come onto the prison grounds, causing a slight delay. IWL is required to use the local union halls to bring in certified welders to fit and weld the underground pipe. At the time, none were available. During this time, CPM II Fechner's team continued excavation, cutting, and preparing the pipes for the welder. Pavich Decl. at ¶ 15; Fechner Decl. at ¶ 23; Vasquez Decl. at ¶ 23.

31. On July 6, 2015, Level I Stationary Engineer Pavich temporarily promoted to Lead Engineer and oversaw the repair to hot water pipes on the Level IV yard. Pavich Decl. at ¶ 6.

32. Prior to this promotion, Pavich had no involvement in the repair of the hot water to the Level IV housing units. Pavich Decl. at ¶ 3.

33. At no time did Pavich have any involvement with the fund request or have authority to restore hot water to Level IV, including Plaintiff's housing unit.

///

Pavich also did not have authority to move Plaintiff.  Pavich Decl. at ¶¶ 4, 5, 12, 14.

34. On or about July 15, 2015, Pavich received Plaintiff's CDCR form 22 Request for Interview complaining about the hot water issue.  Pavich Decl. at ¶ 19.

35. Pavich responded to Plaintiff on July 16, 2015, informing him the hot water should be restored by July 30, 2015.  Compl. at 10; Pavich Decl. at ¶ 20.

36. Plaintiff also verbally complained to Sergeant Leon about the hot water issue. Sergeant Leon submitted a work order to correct the hot water issue.  Leon Decl. at ¶¶ 4-6.

37. On July 25, 2015, isolation valves were installed in the back of Building 4A03, restoring hot water to all of Level IV, including Plaintiff's housing facility. Fechner Decl. at ¶ 25; Pavich Decl. at ¶ 21; Vasquez Decl. at ¶ 24; Llamas Decl. at ¶ 18; Leon Decl. at 18.

38. None of the Defendants - Pavich, Llamas, Leon, or Vasquez – had the authority or ability to turn the hot water in Plaintiff's housing unit back on.  Pavich Decl. at ¶¶ 4, 5, 12, 14; Vasquez Decl. at ¶ 9; Llamas Decl. at ¶¶ 3, 12; Leon Decl. at ¶¶ 15-17.

39. None of the Defendants had the authority or ability to fund the pipe repairs. Pavich Decl. at ¶ 11; Vasquez Decl. at ¶¶ 8, 18; Llamas Decl. at ¶ 4, 10; Leon Decl. at ¶¶ 15-17.

40. Defendants Pavich, Llamas, and Leon had no involvement in the FAMB fund request to repair the leaks.  Nor were they privy to the process.  Pavich Decl. at ¶ 11; Llamas Decl. at ¶ 10; Leon Decl. at ¶¶ 11, 15-17.

41. Because the hot water loss occurred during the summer, many inmates would normally request to take cool showers. The temperature generally hits 80-100 degrees between May and late July at COR and the water temperature remained slightly cooler than tepid.  Pavich Decl. at ¶¶ 9-10; Llamas Decl. at ¶¶ 8-9; Leon Decl. at ¶¶ 10.

42.	Because over 500 inmates were affected by the hot water outage, none of the Defendants had the authority to move or relocate that many inmates. Fechner Decl. at ¶ 16; Pavich Decl. at ¶ 24; Vasquez Decl. at ¶ 16; Llamas Decl. at ¶¶ 12, 14; Leon Decl. at ¶ 14.

43.	Plaintiff complained that it was hot in his cell/housing unit surrounding the relevant time period. Sloan Decl., Exhibit B, Plaintiff's Responses to Motion to Compel Documents (Medical Records) at 15.

44.	Plaintiff had a skin condition requiring a prescription for hydrocortisone cream on May 13, 2015, before the hot water went out on May 18, 2015. Doster Depo at 43:17-22; Medical Records at 6; Declaration of Daniels in Support of Defendants' Motion for Summary Judgment at ¶ 4, Exhibit A.

45.	There are no medical records, other than prescriptions for hydrocortisone cream, that evidence Plaintiff's alleged skin rash during May through September 2015. Medical Records at 5-25.

46.	Plaintiff's skin rash is the only injury or damage claimed from the hot water outage. Doster Depo at 46:13-15.

47.	Plaintiff chose not shower while the hot water was out. Instead, Plaintiff only wiped off with a towel or shaved. Doster Depo at 63:14-64:5.

48.	Plaintiff cannot state how any of the Defendants did not do their due diligence to restore the hot water. Doster Depo at 60:22-61:2.

49.	Plaintiff never had any direct interactions with Defendant Vasquez regarding any plumbing issues. Sloan Decl., Exhibit C, Plaintiff's Responses to Motion to Compel Interrogatories (Interrogatories) at 3.

## VI.	DEFENDANTS' ARGUMENTS

Defendants argue that they did not violate Plaintiff's Eighth Amendment rights. Defendants' evidence includes Plaintiff's allegations in the Complaint; the declarations of R. Daniels, M. Fechner, S. Leon, P. Llamas, R. Pavoch, F. Vasquez, Andrea R. Sloan, and Damien

Doster; the deposition of Damien Doster; Plaintiff's responses to Defendant Leon's Motion to Compel; and Plaintiff's medical records.

### A.     Defendants Did Not Violate Plaintiff's Eighth Amendment Rights

First, Defendants argue that Plaintiff cannot establish that the alleged deprivation was objectively sufficiently serious, because even though Plaintiff went without hot water for more than two months, the temperatures outside ranged from 80-100 degrees and Plaintiff had the option to take cold showers and wash his clothes in cold water. Also, Plaintiff's injury was only a minor rash.

Second, Defendants argue that Plaintiff cannot show they were aware of a substantial risk of serious harm because there was no risk of harm except a minor rash that existed before the hot water went out on May 18, 2015, and on May 13, 2015 Plaintiff had a prescription for Hydrocortisone topical cream to treat his rash on. Defendants also argue that it is difficult to discern whether Plaintiff's rash was caused by the hot water outage as there is no evidence that Plaintiff complained of a worsening or different rash after the hot water went out.

Finally, Defendants argue that Plaintiff cannot establish a causal relationship between Defendants' acts and Plaintiff's alleged damages because Defendants had no control over the hot water restoration or in funding the restoration project, nor authority to move over 500 Level IV SHU inmates to new institutions or other areas of the prison while the hot water pipes were being repaired.

Based on Defendants' arguments and evidence, the court finds that Defendants have met their burden of demonstrating that they did not act with deliberate indifference to a substantial risk of serious harm to Plaintiff. Therefore, the burden now shifts to Plaintiff to produce evidence of a genuine material fact in dispute that would affect the final determination in this case.

///

///

///

///

## 1. __Plaintiff's Statement Of Facts (SOF)__[5]

Plaintiff submitted the following facts in support of his opposition to Defendants' motion for summary judgment. (ECF No. 69 at 8-12 ¶II.)[6]

1. Plaintiff's case now proceeds only on the deprivation of hot water from May 18, 2015 through July 25, 2015, and related negligence claims against defendants Vasquez, Llamas, Leon, and Pavich. Plaintiff contends, and re-asserts that [he was] previously housed at California State Prison, Corcoran (CSP) Corcoran, security housing unit (SHU), building 4A2R. On May 18, 2015, Plaintiff personally informed defendants Vasquez and Leon that his cell did not have hot water. The defendants responded by saying "the hot water would be turned back on in a week or so, stop crying and complaining." On June 6, 2015, Plaintiff forwarded a CDCR 22-request for interview form to defendant Llamas, to which defendant Llamas responded by claiming that Plaintiff's health and safety concerns were a maintenance issue, and could not be corrected at her level. (See Doster Decl.)

2. On July 1, 2015, Plaintiff re-submitted a CDCR 22-request for interview form to defendant Pavich, in which Plaintiff apprised Pavich that he did not have hot water in his cell since May 18, 2015. Pavich responded saying that "he was working on the hot water loop and would have the hot water running by July 30, 2015." (See Doster Decl.)

3. As stated above, defendants Vasquez and Leon informed Plaintiff that his hot water would be turned back on in a week, and to stop crying and complaining. Plaintiff contends and re-asserts that the defendants all had knowledge of [the]

---

[5] The facts reproduced here are from Plaintiff's Statement of Facts. (ECF No. 69 at 8-12 ¶II.) Plaintiff has not submitted an appropriate Statement of Undisputed Facts, as required by Local Rule 260(b). (ECF No. 69 at 13-15 ¶IV.) However, as indicated above at fn.4, the court shall strive to resolve Defendants' motion for summary judgment on the merits.

[6] All page numbers cited herein are those assigned by the court's CM/ECF system and are not based on the parties' pagination of their briefing materials.

hot water issues. The defendants should have "red-lined" Plaintiff's cell and rehoused him elsewhere until the hot water was restored. Plaintiff consistently requested that the hot water in his cell and in the shower be turned back on. In the discovery stage, request for admissions (RFA), all of the defendants admitted to being responsible for the safe custody and care of Plaintiff/Inmates confined in the institutions of the department. (See Doster Decl.)

4.  Plaintiff also has undisputed facts that the defendants refused to "red-line" his cell and rehouse him where there was working hot water in the cell and in the shower, between May 18, 2015 and July 25, 2015. (See Doster Decl.)

5.  (CSP)-Corcoran Chief Engineer I, Lemoine, and Associate Warden of Business Services, Jennings, responded to Plaintiff's appeal on July 27, 2015, and informed Plaintiff that his appeal was "granted" in full at the first level of review, because the hot water issue had been repaired and the hot water had been restored to 4A-yard housing units. Because Chief Engineer I, Lemoine, and Associate Warden of Business Services, Jennings, "granted" in full Plaintiff's appeal CSP-C-5-15-03390, they assumed liability. (See Doster Decl.)

6.  The defendants and their attorney of record are now trying to shift the blame on the Facilities Asset Management Branch (FAMB) and the Inmate Ward Labor (IWL) for the defendants' reckless, evil, and callous indifference. FAMB and IWL are not defendants in this case. The defendants and their attorney of record assume that because there were over 500 inmates on the level 4A yard, and over 80 inmates in Plaintiff's housing unit, that the defendants did not commit any constitutional violation against the Plaintiff. This case is not about 500 inmates or 80 inmates. This case is about the Plaintiff Damien T. Doster. And while none of the defendants had the authority to move over 500 inmates, they did have the authority and ability to move the Plaintiff to a housing unit that had working hot water in the cell and the shower.

///

7.  Finally, as a result of Plaintiff being forced to live in a cell with no hot water at all, or in the shower to properly clean himself or his clothes from May 18, 2015 through July 25, 2015, Plaintiff developed rashes and sores on his body. Again, the defendants and their attorney of record assume that because around the time of the hot water outage the temperature was ranging from 80-100 degrees, Plaintiff should have been grateful to shower in frigid cold water.

8.  The defendants and their attorney of record also claim that Plaintiff's rashes existed before May 18, 2015. Plaintiff does not deny the rashes existed before May 18, 2015. As admitted by defendants in their summary judgment motion, on "May 5, 2015, they became aware of the hot water pipe leak[] affecting the level 4A-yard," only Plaintiff was not aware of it. Around May 12, 2015, Plaintiff had already begun to suffer from skin irritation so he went to the 4A-yard facility doctor who examined him and prescribed hydrocortisone cream. By May 18, 2015, Plaintiff's skin irritation seemed to have morphed into rashes and sores and remained that way until mid-August. (See Doster Decl.)

9.  While Plaintiff has already provided the courts and the defendants with a record of the doctor prescribing hydrocortisone cream to the Plaintiff, it's evident that in order for the Plaintiff to even receive a prescription for hydrocortisone cream, it was determined by the doctor that Plaintiff's rashes were severe enough to prescribe hydrocortisone cream to Plaintiff. The defendants have no record that supports their claim of the Plaintiff suffering from some previous rash or skin condition before May 5, 2015. The serious deprivation and injuries were caused by the lack of hot water, and the defendants' actions in refusing to move Plaintiff.

## 2. **Analysis**

Plaintiff's evidence consists of his allegations in the First Amended Complaint, Plaintiff's declaration, Defendants' responses to Plaintiff's requests for admissions; affidavits of C.E. Reese and G.B. Magana; and Plaintiff's prison records, including medical records.

Plaintiff's evidence does not support his claim that Defendants were deliberately indifferent to a substantial risk of serious harm to Plaintiff and caused him harm.

### a. <u>Sufficiently Serious Deprivation</u>

Extreme deprivations are required to make out a conditions of confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. <u>Farmer</u>, 511 U.S. at 834; <u>Hudson</u>, 503 U.S. at 9. The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. <u>Johnson</u>, 217 F.3d at 731.

The more basic the need, the shorter the time it can be withheld. <u>See</u> <u>id.</u> Substantial deprivations of shelter, food, drinking water or sanitation for four days, for example, are sufficiently serious to satisfy the objective component of an Eighth Amendment claim. <u>Id.</u> 732–733. <u>See</u>, <u>e.g.</u>, <u>Hearns v. Terhune</u>, 413 F.3d 1036, 1042-43 (9th Cir. 2005) (holding that plaintiff's allegation that he was confined in administrative segregation for nine months, during which time he was deprived of clean running water, was sufficient to make out a conditions of confinement claim); <u>see</u> <u>Preayer v. Ryan</u>, 2016 WL 5341177 (D. Ariz. 2016) (lack of running water for two months sufficient to satisfy the objective component of the deliberate indifferent analysis).

### <u>Discussion</u>

The parties do not dispute that Plaintiff was deprived of hot water in his cell and in the shower for more than two months, from May 18, 2015 through July 25, 2015. On May 5, 2015, 4-A yard was having hot water issues. (Pltf's Decl., ECF No. 63 at 23 ¶12; DUF 7.) On May 18, 2015, the hot water was shut off to Plaintiff's housing unit because the prison suffered significant failures on the hot water lines feeding the Level IV-A yard, where Plaintiff was housed. (Amended Complaint (ACP), ECF No. 13 at 9:1-2; DUF 11, 14-17.) Hundreds of other inmates were also without hot water. (P's Facts, ECF No. 69 at 10:21-27; DUF 19.) Plaintiff had cold running water in his cell during all but two days, (Depo., ECF No. 64-10 at 53:21-24), and could take a shower with cold water, (Depo., ECF No. 64-10 at 56:2.) The

outside temperatures ranged from 80-100 degrees. (P's Facts, ECF No. 69 at 11; DUF 41, 43, 47.) Plaintiff admits that he took twenty showers between May 16 and July 25, 2015. (Pltf's Responses to Defts' Request for Admissions, ECF No. 64-10 at 43-46.) Beginning on May 12, 2015, Plaintiff developed rashes and sores on his body, which were not healed until mid-August. (Id.) Plaintiff saw the doctor, who prescribed hydrocortisone cream for the rashes and sores. (Id., Exh. H.)

Plaintiff alleges that warm water cleans better than cold water, arguing that he could not really do a good job of cleaning himself in the cold water. (Depo., ECF No. 64-10 at 56:2-12.) However, Plaintiff's personal belief is not evidence that he could not clean himself well enough using cold water. Even assuming for sake of argument that warm water cleans better than cold water, Plaintiff has not shown that he suffered deprivations denying the minimal civilized measure of life's necessities. While it was inconvenient and more uncomfortable to take cold showers for two months, Plaintiff's deprivation, without more, was not sufficiently serious to satisfy the objective component of an Eighth Amendment claim.

Based on these facts, the court finds that Plaintiff's deprivation of hot water for more than two months, while Plaintiff continued to have cold running water in his cell most of the time and had the ability to take cold showers, fails to rise to the level of an extreme deprivation denying the minimal civilized measure of life's necessities, as required to state a claim under the Eighth Amendment.

### b.     Aware of a Substantial Risk of Serious Harm

A prison official does not act in a deliberately indifferent manner unless the official "*knows of* and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 834 (1994) (emphasis added). The "official must both *be aware of facts* from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw that inference*." Id. at 837 (emphasis added).

The parties do not dispute that Defendants were aware of the hot water issue. However, the court finds no evidence that any of the defendants drew the inference that Plaintiff was at a substantial risk of serious harm because he was without hot water.

**Defendants Vasquez and Leon**

Plaintiff states that on Wednesday, June 3, 2015, defendants Vasquez and Leon were informed that Plaintiff's cell had no hot water and they told Plaintiff the hot water would be back on in a week or a few days, and to quit crying and complaining. (ACP at 9 ¶ 14; at 10 ¶15.) Defendant Leon declares that Plaintiff verbally complained to him about the hot water issue, (Leon Decl. at ¶¶ 4-6), and defendants provide evidence that Associate Warden Vasquez was apprised of all developments in the plan to repair the water system and restore hot water by Correctional Plant Manager Fechner. (Fechner Decl. at ¶¶ 15, 17; Vasquez Decl. at ¶¶ 15, 17.) On June 23, 2015, Warden Vasquez approved a request for final approval for labor to repair the leaks. (Fechner Decl. at ¶ 21; Vasquez Decl. at ¶ 21.) Thus, defendants Vasquez and Leon knew about the hot water issues.

Plaintiff contradicts himself when he alleges that he had direct interactions with defendant Vasquez regarding the hot water issue. In his declaration, Plaintiff states that on June 3, 2015, he personally informed defendants Vasquez and Leon that his cell did not have hot water, to which the defendants responded, "The hot water [will] be turned on in a week or so, stop crying and complaining." (Pltf's Decl., ECF No. 69 at 22-23 ¶6.) However, in his response to Defendants' interrogatories, Plaintiff states that he never had any direct interactions with defendant Vasquez regarding any plumbing issues. (Sloan Decl., Exh. C, Plaintiff's responses to Motion to Compel Interrogatories (Interrogatories) at 3.) This contradiction does not create a genuine dispute of material fact for trial. Whether Plaintiff *personally* informed defendant Vasquez is not material to the disposition of this case.

**Defendant Llamas**

On June 3, 2015, Plaintiff sent a CDCR 22 form request for interview to defendant Llamas, informing Llamas of the hot water issue and the fact that Plaintiff had begun to break out in rashes and bumps, and Llamas responded that it was a maintenance issue and could not be corrected at her level. (Pltf.'s Decl., ECF No. 69 at 23 ¶ 7; DUF 26, 27.) On July 1, 2015, Plaintiff resent his Request for Interview to Llamas demanding that she fix the hot water issue.

///

(DUF 28.) Defendant Llamas then forwarded Plaintiff's request to defendant Pavich in Maintenance. (DUF 28.) Thus, defendant Llamas was aware of the hot water issue.

**Defendant Pavich**

On July 1, 2015, Plaintiff re-submitted a CDCR 22 form for interview to defendant Pavich, informing him about not having hot water, and Pavich responded that he was working on the hot water loop and would have the hot water running by July 30, 2015. (ACP at 10 ¶ 17; Pltf's Decl., Doc. 69 at 23 ¶ 8.) On or about July 15, 2015, Pavich received Plaintiff's CDCR form 22 Request for Interview complaining about the hot water issue, and Pavich responded to Plaintiff on July 16, 2015, informing him the hot water should be restored by July 30, 2015. (DUF 34, 35.) Thus, defendant Pavich knew about the hot water issue.

**Discussion**

Although there is no dispute that Defendants all knew of the hot water issue, the court finds no evidence that any of the Defendants drew the inference that Plaintiff was at substantial risk of serious harm because he did not have hot water.

### c. Acted Unreasonably or With Deliberate Indifference

There is no indication in Plaintiff's evidence that any of the Defendants had the state of mind necessary to support a claim for deliberate indifference. An official who knows of a substantial risk of harm to an inmate's health or safety but *acts reasonably under the circumstances* will not be held liable under the cruel and unusual punishment clause, even if the threatened harm results. See Farmer, 511 U.S. at 843 (emphasis added).

Even if Defendants knew Plaintiff was at an excessive risk of harm, the court finds no evidence that any of the Defendants acted unreasonably. Defendants admitted that they were responsible for the safe custody and care of Plaintiff. (ECF No. 69 at 30:1-5, 35:8-12, 40:17-22; 46:14-18, Defts' admissions.) However, there is no evidence that Defendants were responsible for the stoppage of the hot water or had the authority or ability to restore it. The underground water pipes were approximately thirty years old and the insulation around the pipes had exceeded its life expectancy, causing the pipes to rust through and leak. (Fechner Decl. at ¶ 6; Vasquez Decl. at ¶ 6.) On May 18, 2015, the institutional hot water system

suffered a significant failure on the water lines feeding the level IV A yard, causing major water leaks. (Fechner Decl. at ¶ 9; Pavich Decl. at ¶ 6; Vasquez Decl. at ¶ 9; Llamas Decl. at ¶ 6.) On May 18, 2015, hot water to the institution Levels I and IV were isolated and turned off. (ACP at 9 ¶ 10; Doster Depo, ECF No. 64-10 at 53:3-5; Doster Decl. at 1; Fechner Decl. at ¶ 9; Pavich Decl. at ¶ 8; Vasquez Decl. at ¶ 9.) The leak affecting the Level IV yard required abandoning the water supply and returning it in the ground with pre-fabrication of new pipe, which required the IWL's (Inmate Ward Labor) assistance for material, manpower, equipment, and expertise. (Fechner Decl. at ¶ 13; Vasquez Decl. at ¶ 13.) Other leaks were also discovered that required excavation of the area, pulling up the parking lot and road, and lifting out piping with a crane. (Fechner Decl. at ¶¶ 11-13; Vasquez Decl. at ¶¶ 11-13.) Work could not begin until CSP received emergency funding for the project, and the FAMB was wholly responsible for approving the funding and requesting the work to be done. (Fechner Decl. at ¶ 18; Vasquez Decl. at ¶ 18.) It was not until mid-June 2015 that work could begin to restore the hot water. (Fechner Decl. at ¶¶ 19-22; Vasquez Decl. at ¶¶ 19-22.)

**Discussion**

The court finds that Defendants acted reasonably in response to the shutdown of hot water and in response to Plaintiff's requests. On June 3, 2015, upon being notified that Plaintiff's hot water was off, defendants Vasquez and Leon told Plaintiff that the hot/warm water would be back on in a week or few days and to quit crying and complaining. (ACP, ECF No. 13 at 9-10 ¶¶14-15.) On June 6, 2015, defendant Llamas told Plaintiff that the hot water issue was a maintenance issue and could not be corrected at her level. (ACP at 10 ¶16.) On July 15, 2015, defendant Pavich responded that he was working on the hot water loop and would have the hot water running by July 30, 2015. (ACP at 10 ¶ 17.) There is no evidence that any of the Defendants reasonably could have done more to respond to the shutdown of hot water.

Plaintiff argues that it was unreasonable that Defendants did not move him out of his cell until the hot water was restored. Plaintiff asserts that all of the Defendants had the authority to "red line" his cell, i.e., declare it unsafe for occupancy until the hot water was

restored. (ACP, ECF No. 13 at 10¶ 18.) However, Defendants were faced with the fact that hundreds of inmates at CSP were unexpectedly without hot water in their cells and the showers. Under these circumstances, Defendants' obligation was to solve the problem for *all* of the inmates, and it would have been unreasonable for them to *only* help Plaintiff. Escorting hundreds of inmates to another yard or moving them to another facility was not feasible. (Fechner Decl. at ¶ 16; Leon Decl. at ¶ 12; Vasquez Decl. at ¶ 16; Llamas Decl. at ¶¶ 12, 14.)

### d. <u>Caused Harm</u>

To state a deliberate indifference claim, a causal relationship between Defendants' acts and Plaintiff's alleged damages must be shown.

Here, Plaintiff alleges that he suffered from rashes and sores on his body as a result of deprivation of hot water in his cell and the shower for more than two months. However, sweeping conclusory allegations will not suffice to prevent summary judgment. <u>See</u> <u>Berg</u>, 794 F.2d at 460. Plaintiff's evidence does not support his assertion that the skin rash resulted from the shutdown of hot water. Plaintiff admits that he noticed the skin rash and saw the doctor on May 13, 2015, *before* the hot water was shut off on May 18, 2015. (Pltf's Decl., ECF No. 69 at ¶ 13.) Under these facts, the rash could not have been the result of the shutdown of hot water.

Moreover, under Federal Rules of Evidence 701, Plaintiff, a layperson, may not offer medical opinions or conclusions based on his symptoms or the course of his medical treatment. Plaintiff's opinion that he developed a rash because he was deprived of the ability to take hot or warm showers is evidence of what he believes, but not necessarily of what actually caused the rash. Only an expert witness with specialized knowledge may determine whether the deprivation of hot water was the cause of Plaintiff's medical condition.

Because Plaintiff has not provided evidence that his skin rash was due to the deprivation of hot water, or that he was deprived of hot water because of Defendants' conduct, Plaintiff fails to establish that he suffered any damages in this case.

### B. <u>Negligence</u>

Plaintiff also proceeds with a state negligence claim against Defendants based on his allegations in the First Amended Complaint. If the court grants Defendants' motion for

summary judgment on Plaintiff's federal claims against them, the court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims against them. See Sanford v. MemberWorks, Inc., 625 F.3d 550, 561 (9th Cir. 2010). ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." (internal quotation marks and citation omitted)).

Defendants argue that Plaintiff cannot prove that Defendants' direct actions caused Plaintiff's alleged rash. Defendants assert that Plaintiff concedes this in his deposition when he admits that he could not state how any of the Defendants did not do their due diligence to restore the hot water. (Doster Depo., ECF No. 64-10 at 58:22-59:2.) Defendants assert that they provided ample evidence showing they did not have the ability to make the repairs and restore hot water without funding from the FAMB and labor from the IWL, both entities they had no control over. Defendants also assert that they demonstrated that they did not have the authority or ability to transfer hundreds of inmates who were affected by the hot water outage.

Defendants also argue that Plaintiff's damages are minimal and that Plaintiff cannot provide any medical records to support his alleged rash other than prescriptions for hydrocortisone cream, which began before the May 18, 2015 water outage. Defendants argue that Plaintiff's failure to properly bathe himself is more likely the cause of his alleged rash since he admits he did not shower for approximately two and a half months.

Evidence shows that Defendants admitted that they were responsible for the safe custody and care of Plaintiff. (Doster Decl., ECF No. 69 at 23 ¶10, Exh. A.) However, the court finds no evidence that Defendants breached their duty to keep Plaintiff safe and care for him, or that Plaintiff sustained injuries that were caused by Defendants' conduct. As discussed above, Plaintiff has not provided evidence that his skin rash was due to the deprivation of hot water, that he was deprived of hot water because of Defendants' conduct, or that he suffered any damages in this case. Therefore, the court finds that Plaintiff cannot succeed on his negligence claim against Defendants.

**C. Immunity**

Defendants argue that they are entitled to immunity for any of their conduct found to violate Plaintiff's rights in this case.

With respect to Plaintiff's negligence claim, Defendants argue that under California Government Code Section 845.2, "[e]xcept as provided in Chapter 2 (commencing with Section 830), neither a public entity nor a public employee is liable for failure to provide a prison, jail or penal or correctional facility or if such facility is provided, for failure to provide sufficient equipment, personnel or facilities therein." Also, Defendants cite California Government Code Section 820, which provides that "except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person."

With respect to Plaintiff's federal claims, Defendants argue that they are entitled to qualified immunity for their actions in this case. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, --- U.S. ---, 135 S.Ct. 2042, 2044 (June 1, 2015) quoting Reichle v. Howards, 566 U. S. 658, 132 S.Ct. 2088, 2093 (2012). Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009).

As discussed above, the court has found that Defendants were not negligent, nor did they violate Plaintiff's constitutional rights. Therefore, the issue of immunity shall not be addressed.

**D. Compensatory or Punitive Damages**

Defendants argue that absent proof of actual injury, Plaintiff is not entitled to compensatory damages, and absent proof of evil intent, Plaintiff is not entitled to punitive damages. Given that the court has found that Defendants are entitled to summary judgment, it is unnecessary to consider this argument. As discussed above, the court finds that Plaintiff did

not suffer any injury or damages as a result of Defendants' conduct, and Plaintiff has not shown that any of the Defendants acted against him with deliberate indifference. Therefore, the issue of Plaintiff's entitlement to compensatory or punitive damages in this case is moot.

## VII. CONCLUSION AND RECOMMENDATIONS

Defendants have submitted evidence that they did not act with deliberate indifference or negligence in their conduct during the hot water shutdown, and Plaintiff did not produce any evidence in response that created a disputed issue of material fact. Accordingly, Defendants are entitled to judgment on Plaintiff's Eighth Amendment and negligence claims against them, and Defendants' motion for summary judgment, filed on November 30, 2017, should be granted.

Therefore, **IT IS HEREBY RECOMMENDED that:**

1. Defendants' motion for summary judgment, filed on November 30, 2017, be **GRANTED;** and

2. Summary judgment be entered in favor of Defendants, closing this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within fourteen (14) days** from the date of service of these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed **within ten (10) days** after the date the objections are filed. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  __June 8, 2018__          _____ **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE